EARL R. COMPTON and Carolyn W. Compton, Plaintiffs–Appellants,

v.

AETNA LIFE INSURANCE AND ANNUITY COMPANY, Defendant–Appellee.

No. 91–7356.

United States Court of Appeals, Eleventh Circuit.

March 25, 1992.

David C. Johnson, Johnson & Cory, Ronald O. Gaiser, Jr., Birmingham, Ala., for plaintiffs-appellants.

Michael C. Quillen, Cabaniss, Johnston, Gardner, Dumas & O'Neal, Samuel M. Hill, Birmingham, Ala., for defendant-appellee.

Before COX, Circuit Judge, JOHNSON * and REAVLEY **, Senior Circuit Judges.

REAVLEY, Senior Circuit Judge:

Appellants Earl and Carolyn Compton sued appellee Aetna Life Insurance and Annuity Co. (Aetna) for breach of contract and fraudulent suppression, among other things. After dismissing the Comptons' related claims, the district court granted Aetna summary judgment on the Comptons' contract and suppression claims. We affirm.

---

\* *See* Rule 34–2(b), Rules of the U.S. Court of Appeals for the Eleventh Circuit.

\*\* Honorable Thomas M. Reavley, Senior U.S. Circuit Judge for the Fifth Circuit, sitting by designation.

## I. BACKGROUND

In September 1988, the Comptons applied for health insurance coverage under a policy issued by Aetna (the Policy). Aetna developed the Policy exclusively for members of the Professional Association of Crafts and Trades (PACT) and executed an insurance contract with PACT. Upon receiving the Comptons' application, Aetna sent the Comptons a certificate (the Certificate) that described the Comptons' coverage under the Policy, but expressly made the Policy "the whole contract" between Aetna and the Comptons. The Certificate froze the Comptons' initial monthly premium at $172.40 for one year and then stated:

Premium Rates—Premiums for each certificate year are based on the age of each Covered Person on the first day of that year and the table of rates then in effect. Premiums are expected to increase each year.

Changes In Premium Table—Aetna has the right to change the table of premium rates. The change will take effect on the first day of the certificate year. Aetna must provide the Member with written notice of the change at least 30 days before the effective date.

The Certificate concludes with the following:

Policy Changes—The policy may be changed at any time by written agreement between Aetna and PACT. The consent of the Insured or any other person is not needed. All agreements made by Aetna are signed by one of its executive officers. No person can change or waive any of the policy terms or make any agreement binding on Aetna. PACT will not have to give approval of a change in the policy if PACT has asked for the change and Aetna has agreed to it.

The Certificate's front page states:

Please read this certificate. If the insurance does not meet your needs, send this certificate back, within 10 days after you receive it, to Aetna or the representative through whom it was purchased. A full refund will be made. Then the insurance

will be as though it had never been in force.

The Comptons did not exercise this option. Although the Comptons do not admit that they received a rider with the Certificate, they do admit that they received Rider 24488 (the Rider) from Aetna. The Rider makes the following changes in the Policy and Certificate as of October 1, 1988:

the Premium Rates section and the Changes in Premium Table section are deleted and replaced by the following:

.    .    .    .    .

Premium Rates—Premiums for each certificate year are based on the age of each Covered Person on the first day of that year and the table of rates then in effect on the premium due date. Premiums may depend on smoker/non-smoker status, family discount, residence, sex, current loss experience class for renewals, and such other factors as Aetna may determine from time to time.

Changes in Premium Table—Aetna has the right to change the table of premium rates. The change will take effect on any premium due date. Aetna must provide the insured with written notice of the change at least 30 days before the effective date.

An Aetna agent signed the Rider.

Approximately one month after purchasing the Certificate, Mrs. Compton suffered a stroke and received approximately $90,000 in Policy coverage from Aetna. On the Certificate's first anniversary, in September 1989, Aetna raised the Comptons' monthly premium from $172.40 to $543.10. In March 1990, Aetna increased the premium to $641.39. In September 1990, Aetna increased the premium to $842.36. According to the uncontroverted affidavit of Gregory W. Chicares, an Aetna actuary, the Comptons' premium increased because of:

(1) staggered, across-the-board Policy increases totaling 113.2% due to rising health care costs;

(2) the fact that Mrs. Compton's claims on the Policy exceeded the Comptons' premium payments, which placed them in the highest of six risk groups under the

Policy and increased their premiums by 50%;

(3) the Comptons' aging (6.63% for Mrs. Compton and 12.77% for Mr. Compton);

(4) the fact that Aetna began to account for the sex of its insureds under its rating system (3.94%);

(5) the area of the Comptons' residence (5.7%); and

(6) the fact that the Comptons' premium was payable monthly (5.8%).

The Comptons claim that Aetna breached the Certificate when it increased their premium by 489% over the course of two years. They also claim that Aetna fraudulently concealed the basis for its premium increases. The district court rendered summary judgment against the Comptons on these claims because the Comptons failed to produce any substantial evidence to show that the Rider was not part of the contract between Aetna and the Comptons, because Aetna increased the Comptons' premium in accord with the Rider, and because the Rider disclosed the basis for the premium increases.

## II. DISCUSSION

Under the undisputed facts recited, Aetna prevails as a matter of contract and tort law.

### A. BREACH OF CONTRACT

The Comptons bought the Certificate and continued their coverage under it after being advised that Aetna reserved the right to change the Certificate's terms upon agreement with PACT. Aetna exercised that right in adopting the Rider, and increased the Comptons' premium according to the Rider. In fact, the only increase that Aetna based on a factor that was not explicitly listed in the Rider was the relatively insignificant increase of 5.8%, which Aetna attributed to the Comptons' manner of premium payment. Aetna based this increase on the Rider's catch-all clause.

■ The Comptons invite us to interpret Aetna's repeated use of the term "table of rates" to mean that, even under the Rider, Aetna was required to have employed a single table of rates to determine the Comptons' premium. We refuse. The Rider lists several factors that Aetna planned to consider in its premium determinations. The fact that Aetna used the term "table" in the singular does not relegate Aetna to basing its premiums on only two of the factors that it listed. Webster defines a "table" as "a systematic arrangement of data usu[ally] in rows and columns for ready reference." WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY 1200 (1985). A single table may account for more than two variables. Nor is it significant that Aetna may never have determined the Comptons' premiums from a single table; the language that Aetna employed in the Certificate and Rider did not preclude it from taking into account all of the factors that it indicated would be relevant to its premium determinations.

■ The Comptons also argue that the experience rating system employed by Aetna made the Comptons' premium depend on their use of the Policy, not any table. The Comptons' premium did depend to some extent on their history of claims under the Policy. Based on the amount of their claims compared to their premiums paid, Aetna placed them into a risk pool and based a premium increase percentage on their risk-pool number. Thus, as expressly provided in the Rider, Aetna used the Comptons' claim experience as one factor in calculating their premium. This accords with, rather than contradicts, the Rider's "table of rates" language.

■ Finally, the Comptons claim that Aetna breached the Certificate's express terms by raising their premium more than once in a year. But the Rider expressly deletes from the Certificate the provisions that the Comptons rely upon. The Rider replaces those provisions with the statement, "Aetna has the right to change the table of premium rates. The change will take effect on any premium due date." The Comptons' premium was due each month. Aetna breached no contract by raising the Comptons' premium semi-annually.

### B. FRAUDULENT SUPPRESSION

██ Not only do the Comptons admit having received the Rider from Aetna, they admit receiving a letter from Aetna two months before the first anniversary of their policy that explains that their rates will be based on claim experience, gender, area, and age. There is no evidence that Aetna, by act or omission, concealed any fact from the Comptons, let alone that Aetna intentionally deceived them. *See Miles v. Tennessee River Pulp and Paper Co.,* 862 F.2d 1525, 1528 (11th Cir.1989) ("to support a cause of action for fraudulent suppression [under Alabama law], one must produce evidence of a present intent to deceive by the suppression or active concealment of an existing material fact").

### III. CONCLUSION

We recognize that it may seem unfair to allow Aetna to alter the Certificate's terms without the Comptons' consent and begin basing the Comptons' premium in part upon the amount that they used their health insurance.[1] But whether these types of insurance policies should be allowed is a legislative question. This court decides only the breach of contract and fraudulent suppression claims.

AFFIRMED.

---

**1.** However, careful examination of the Comptons' premiums suggests that Aetna did not egregiously take advantage of the Comptons. The rationale behind group insurance is to shift the risk of financial loss from a catastrophic illness such as the one suffered by Mrs. Compton to a group. A small number of the group use the premiums of the whole to offset the costs of treating a major illness. Contrary to the Comptons' arguments, their Certificate effectively shifted the risk of financial ruin from Mrs. Compton's stroke to the PACT policyholders.

Without any premium increase due to Mrs. Compton's stroke, the Comptons' monthly premium would have risen to approximately $516 by September 1990 due to the Comptons' aging, area of residence, and (mostly) to skyrocketing health care costs in this country. Because of Mrs. Compton's stroke, Aetna charged the Comptons approximately $842 per month. But an Aetna actuary testified that the Comptons' position in the highest claim experience pool is calculated based on a three-year rolling average. This means that Mrs. Compton's $90,000 claim against the Policy could only be used to increase her premium for three years. Thus, at the very most, Aetna asked the Comptons to pay (12 months) × (3 years) × ($842 − $516) = $11,736 in extra premiums as a result of Mrs. Compton's $90,000 claim. The Comptons thus succeeded in shifting 86.9% of the cost of her treatment to the PACT members who bought into Aetna's Policy.